SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-01-0103-AP |
| Appellee, | ) | |
| | ) | Pima County Superior |
| v. | ) | Court |
| | ) | No. CR-64663 |
| CHRISTOPHER BO HUERSTEL, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |

Appeal from the Superior Court in Pima County
No. CR-64663
The Honorable Michael Brown, Judge (Retired)

**REVERSED AND REMANDED**

Janet A. Napolitano, Former Attorney General
Terry Goddard, Attorney General                                    Phoenix
    by   Kent E. Cattani, Chief Counsel Capital
        Litigation Section
    and  Monica Beerling Klapper, Assistant Attorney
        General
    and  Bruce M. Ferg, Assistant Attorney General      Tucson
Attorneys for Appellee

Law Offices of Williamson & Young, PC                              Tucson
    by   S. Jonathan Young
Attorney for Appellant

**R Y A N**, Justice

¶1      A Grand Jury indicted Christopher Bo Huerstel and his co-defendant, Kajornsak Prasertphong, charging them with three counts of first degree murder for the January 17, 1999 deaths of Robert Curry, Melissa "Lisa" Moniz, and James Bloxham at a Pizza Hut restaurant in Tucson.  The indictment also charged Huerstel and

1

Prasertphong with three counts of armed robbery in connection with the murders. The cases generated a significant amount of media attention in Tucson. Consequently, the trial court granted a motion for change of venue to Yavapai County. The court also granted a motion to sever the trials, but ruled that because enough similarity existed between the cases in terms of facts and witnesses, conducting the trials before a single judge with dual juries would be the most efficient way to try the cases.

¶2        Huerstel's jury convicted him of three counts of first degree felony murder and three counts of the lesser-included offense of attempted armed robbery. Following an aggravation and mitigation hearing, the trial judge sentenced Huerstel to death for the murders of Moniz and Bloxham, and to a prison term of natural life for the murder of Curry. *See* Arizona Revised Statutes ("A.R.S.") § 13-703 (1994). The judge also sentenced him to fifteen years in prison for each of the three attempted armed robbery counts. A Notice of Appeal to this court was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2(b) and A.R.S. section 13-4031 (2001). This court has jurisdiction under Article 6, Section 5.3 of the Arizona Constitution and A.R.S. section 13-4031.

## I.

¶3        Huerstel raises twenty-three issues on appeal, most of

2

which are meritless.[1]  However, because we conclude the trial court's actions coerced the jury's verdicts, we must reverse and remand for a new trial.  Accordingly, this opinion addresses only that issue and also those that will likely arise at retrial.  We therefore only set forth the facts relevant to the issues we address.  For a detailed account of the crimes and subsequent events see the opinion issued today in *State v. Prasertphong,* ___ Ariz. ___, ___ - ___, ¶¶ 2 -15, ___ P.3d ___, ___ - ___ (2003).

## II.

¶4     Huerstel presents several claims concerning the jury deliberations in this case: first, the actions of the trial judge coerced the jury verdict; second, the trial judge engaged in an improper *ex parte* communication with a juror; third, there was "dissension" among the jurors; and fourth, the jury deliberated in small groups.  Because the trial judge's actions improperly influenced the jury's verdict, we focus on that claim.

## A.

¶5     In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the

---

[1]     This court discourages the "kitchen sink" approach to appellate advocacy. *State v. Bolton,* 182 Ariz. 290, 299, 896 P.2d 830, 839 (1995).  Rather, we encourage appellate advocates to narrow their focus to those issues raised at trial that have arguable merit. *Id.*

3

circumstances and attempts to determine if the independent judgment of the jury was displaced. *State v. McCrimmon,* 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996); *State v. McCutcheon,* 150 Ariz. 317, 320, 723 P.2d 666, 669 (1986) (*McCutcheon I*). In this case, the issue can best be understood within the context of a comprehensive recounting of the slightly more than three and one-half days of jury deliberations.

**B.**

¶6 The trial lasted about three weeks, beginning on August 21, 2000. The trial court gave the jury its final instructions on September 11, 2000, and the jury deliberated for a short time that afternoon. The next day, September 12, the jury deliberated all day. During that time, the court received several questions from the jury asking whether certain items were in evidence. At no time did the jury indicate that it had reached an impasse or was having difficulty. The court excused the jury at 4:40 in the afternoon and instructed it to come back the next morning at 9:00. After excusing the jury, the trial judge told counsel he intended to give the jurors an additional instruction, essentially asking if the jurors were having problems and to "give them some direction." Both attorneys believed that such an instruction was premature.

¶7 The jury deliberated all day on September 13. It asked only one question about the credentials of an expert witness and gave no indication of an impasse. The trial court did not give the

4

proposed instruction it had discussed the evening before.

¶8      On the morning of September 14, the court received a question from the jury about an evidentiary matter and an instruction.  After consulting with counsel, the court sent in a response.  Then, at the end of the day, the court told counsel it intended to give the jury an impasse instruction based on the comment to Rule 22.4 of the Arizona Rules of Criminal Procedure. Counsel for Huerstel objected to giving any part of the instruction.  The State asked the court to "rethink" the last paragraph because the jury had not indicated it needed help.  The court overruled all objections and then read the following instruction to the jury:

> Ladies and Gentlemen:
>     If you are having problems or difficulties in reaching an agreement, you may wish to identify areas of agreement and areas of disagreement.  You may then wish to discuss the law and the evidence as they relate to your areas of disagreement.
>     If you still have disagreements you may wish to identify for the court and counsel which issues or questions of law or fact you would like counsel or the court to assist you with.  If you elect this option, please list in writing the issues where further assistance might help bring about a verdict.
>     I do not wish or intend to force a verdict.  We are merely trying to be responsive to your apparent need for help.  If it is reasonably probable that you could reach a verdict as a result of this procedure, it would be wise to give it a try.

The court then excused the jury for the day.

¶9      Later, after counsel and the defendant had left the courthouse, Juror H. approached the trial judge.  Immediately after

5

their conversation, the judge dictated the gist of the encounter to his court reporter for the record, essentially stating that he had been "accosted" by the juror asking "how long this had to go on." Juror H. also told the judge "she was not the only one that was being yelled at, *she was not the only one holding her position, that others were also having – had the same position that she did, whatever that was.*" (Emphasis added.) The judge told the juror that arguments are part of the deliberative process. According to the judge, the juror mentioned neither her position with respect to the verdict nor the positions of the rest of the jurors.

¶10 The next day, September 15, the court disclosed the *ex parte* communication to counsel. Huerstel moved for a mistrial based on the length of the deliberations, the *ex parte* communication, juror dissension, and the coerciveness of the instruction the judge had given the jury the day before. He also requested that the jury be brought in and asked if further deliberations would result in a verdict. The court denied the mistrial motion and the request to ask the jury if it had reached an impasse. The court told counsel that when the jury came in to start deliberations, it would give the jury a written copy of the instruction it had given orally the evening before.

¶11 Later that morning, the court received two notes from the jury. The first note stated the following:

Eleven members of the jury agree that we have not fully

deliberated all the facts of the case and have an open mind. *One juror says that his/her mind is made up and no amount of discussion will change his/her opinion.* Any suggestions?

(Emphasis added.) The second note came from an individual juror asking to be removed from the jury "[d]ue to conflicting personalities and my sanity."

¶12 In response to the second note, over Huerstel's objection, the judge sent a note to the individual juror advising him or her that a meeting with a social worker could be arranged, and if it was found that further service was dangerous to the juror's mental health, he or she could be excused.[2] In response to the jury's first question regarding what to do with the single juror whose mind was made up, the judge sent the following note:

Can you list the specific issues that are a problem *with the juror who allegedly refuses to deliberate any further?* [E].g.[,] One or more of the instructions, some factual area?

(Emphasis added.)

¶13 Huerstel argued it was inappropriate for the court to ask the holdout juror to support his or her position. At this stage in the process, the court knew that the jury was split eleven to one, with the one juror emphatically stating "no amount of discussion will change his/her opinion."

---

[2] Soon after this response was sent, the juror responded that no mental health counseling was necessary and that the juror would "tuff [sic] it out."

7

¶14     The jury responded to the judge's request as follows:

> [Huerstel's] statement to police proves to me he did not
> know specifics about shootings. Hence could not have
> been the shooter. Hence invalidates his confession. And
> with other evidence lead[s] me to to [sic] my firm
> conclusion to all charges.
>
> This is the response of the juror in question. *He/she
> states that no explanation will change his/her mind.*

(Emphasis added.) This response contained two different types of handwriting, with the first paragraph of the note in one type of handwriting and the remaining portion of the note in another. At this point, the court knew the holdout juror favored acquittal and that no further explanation would change his mind. Counsel for both parties agreed that the holdout juror was firmly convinced of his position and that the jury was deadlocked.

¶15     Instead of declaring a mistrial, the court, over Huerstel's objection, sent the following note to the jury:

> It has been my experience that jurors want to do
> justice. It is also my experience that jurors may, in
> good faith, disagree about interpretations of the law or
> the facts.
> The court would propose that the lawyers reargue
> these issues for you in an effort to be of assistance.
> The court does not insist that you arrive at a verdict
> and this is not an effort to coerce or pressure any of
> you. However if this suggestion might be helpful it may
> be worth it to try. Please let us know?

Following this note, the jury responded saying, "We would appreciate the opportunity to clarify these points." This response came just before the jury broke for lunch that day. The court then gave the following response to the jury when it returned from

lunch:

> Thank you for your response.  It appeared to be a response from the jury *as opposed to the juror in question.*  We need to know if he/she would like anything reargued and, if so, what.  If he/she does not wish to have the matter reargued it would be inappropriate for us to do so, since that might easily be construed as coercive.
> While all of us would like to see this case resolved it may not be possible to do so.  If that is the case we should acknowledge that reality, whether we like it or not.  Please let us know.

(Emphasis added.)  In addition to this response to the jury, the court also answered a factual question that apparently had been submitted before the lunch break.  The jury's question concerned the bloodtype of the blood found on various bullet slugs from the crime scene.  The court answered that no evidence of the bloodtypes was introduced.  Therefore, the jury had nothing new to consider.  One hour and twenty minutes after the court submitted the above responses, the jury returned a verdict.

## C.

¶16     The instruction the court gave the jury at the conclusion of its third full day of deliberations came verbatim from the comments to Rule 22.4 of the Arizona Rules of Criminal Procedure.  Although the instruction itself may not have been objectionable, Huerstel argues the timing of the instruction was.

¶17     Rule 22.4 permits judges to assist juries that are at an impasse.  In this case, the jury had asked questions of the court, but never advised the court it had reached an impasse before the

9

court gave the instruction. The rule states that "[i]f the jury advises the court that it has reached an impasse," the court may ask the jurors if the court or counsel can assist them. Ariz. R. Crim. P. 22.4. Although the rule gives a trial judge broad discretion in dealing with juries at an impasse, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered. *Cf. People v. Brown,* 362 N.E.2d 820, 822 (Ill. App. Ct. 1977) (stating that before giving an impasse instruction, the better practice is for trial judges to inquire of the jury whether it is at an impasse if the jury does not clearly indicate so on its own). Three days of deliberation on a case that lasted three weeks did not clearly signal that this jury had reached an impasse. We find nothing in the record indicating why the trial court thought the jury was at an impasse. The court violated Rule 22.4 when it gave the jury the impasse instruction without any clear evidence the jury needed help.[3]

¶18    Nonetheless, only minutes after the instruction had been read to the jury, a juror "accosted" the trial judge outside his chambers, telling him the deliberations were contentious. This circumstance suggests that the jury may in fact have been in need of assistance, although it had failed to articulate that fact to

---

[3]    Huerstel also argues that the court should not have offered to allow counsel to reargue portions of the case for the jury. However, the comments to Rule 22.4 clearly contemplate allowing judges to do exactly that. *See* Ariz. R. Crim. P. 22.4 cmt.

10

the court. Consequently, standing alone, the court's premature giving of the instruction recommended by the comment to Rule 22.4 does not rise to the level of reversible error. However, we consider the premature giving of the instruction in our analysis of whether, under the totality of the circumstances, the trial court coerced the jury verdict.

¶19 Of more concern is the court's suggestion to the jury that it consider having the attorneys reargue certain issues when the court knew that one juror had twice stated his mind was made up and no further explanations would be of assistance. The State relies on *State v. Sabala,* 189 Ariz. 416, 420, 943 P.2d 776, 780 (App. 1997), which held it was not coercive for a trial court to offer assistance in the form of an instruction based on Rule 22.4, although it knew the numerical split of the jury and which way the jury was leaning. *Sabala* stands for the proposition that offering assistance to a jury that has reached an impasse, even when the trial court knows the jury's split, is not per se coercive. *Id.* at 418-19, 943 P.2d at 778-79. Nevertheless, although a trial court's awareness of the jury's split when it offers help under Rule 22.4 does not conclusively establish coercion, such a circumstance is a factor in the totality of the circumstances analysis.

¶20 The State correctly points out that in *Sabala,* and in this case, the trial court gave the jury the recommended Rule 22.4 instruction. *Id.* at 419, 943 P.2d at 779. But three facts

11

distinguish this case from *Sabala.* First, when the trial court twice gave further instructions to the jury advising it that help was available, it knew the jury was split eleven to one, with the one juror favoring acquittal. Second, it knew the holdout juror had clearly expressed the opinion that no further discussions would change the juror's mind. Third, none of the latter instructions tracked the Rule 22.4 language. Although the Rule 22.4 instruction in the abstract may not be coercive, and as the decision in *Sabala* held, it may not be coercive even if the court is aware of the split, this case goes beyond those principles because the subsequent instructions specifically focused on the holdout juror.

¶21     The State also cites *Sabala* for the proposition that when a jury deliberates further after receiving an instruction based on Rule 22.4, and considers additional information before returning a verdict, one must assume the juror in question changed his position due to the consideration of the additional information. *Id.* at 420, 943 P.2d at 780. Again, *Sabala* is distinguishable. Here, after the court had given the Rule 22.4 instruction, it gave additional instructions that did not track the suggested language of the comment to the rule. Moreover, these latter instructions focused on the holdout juror. Finally, the jury did not have any new information to consider during its final period of deliberations. The court's response to the jury's question about blood on bullet slugs from the crime scene told the jurors that no

12

evidence on that issue had been introduced.

¶22     Huerstel's final argument on this issue is that the trial court's instructions asking the holdout juror to explain his position was coercive. Although the trial court stated it was not trying to coerce a verdict, we conclude that the holdout juror more likely than not understood the court's responses as an indication that the juror should consider changing his views.

¶23     A similar situation occurred in *McCutcheon I*, in which this court held the trial court's actions were coercive. 150 Ariz. at 320, 723 P.2d at 669. In that case, the trial court became aware of a ten to two split in favor of a guilty verdict. *Id.* at 318, 723 P.2d at 667. The court subsequently questioned the jury foreman in open court as to whether the jury would be able to reach a verdict in a reasonable time. *Id.* at 318-19, 723 P.2d at 667-68. During this exchange, the court asked the foreman if the jury could "reach a verdict *on one count against the defendant?*" *Id.* at 319, 723 P.2d at 668. This court said the following:

> Since the jury knew that the trial judge was aware the majority had voted for conviction, her repeated questions sent an inference that she agreed with the majority. We believe she implicitly communicated to the dissenters the message that she thought they should change their views, since that would be the only way, in all likelihood, a verdict could be reached. Any pressure to decide then was pressure to decide against the defendant.

*Id.* at 320, 723 P.2d at 669. Additionally, in *State v. Lautzenheiser,* 180 Ariz. 7, 10, 881 P.2d 339, 342 (1994), the court

13

concluded that singling out a juror, even in the polling process, could potentially cause harm by making it likely the individual juror will be subject to pressure by his fellow jurors.  *See also State v. Roberts,* 131 Ariz. 513, 517, 642 P.2d 858, 862 (1982) (Feldman, J. dissenting) (noting that when inquiry into the numerical division of the jury reveals a single holdout juror the likelihood of coercion increases when the court orders further deliberations).  We think this case raises comparable, if not more significant, concerns.[4]  Here, the trial court directly addressed the holdout juror twice in such a way as to effectively communicate to the juror that the juror should reconsider his views.

¶24    The State, however, argues that the court told the jury at the beginning of deliberations that the parties were "entitled to the individual opinion of each juror" and that a juror should not change his or her opinion "for the mere purpose of reaching a verdict."  Also, the State points out that the court's supplemental instructions to the jury "repeatedly invited them to say so if deadlock had occurred."  The State thus contends that it would be

---

[4]    We note the concern in both *McCutcheon I* and *Lautzenheiser* related to the trial court's order to conduct further deliberations.  *McCutcheon I,* 150 Ariz. at 319, 723 P.2d at 668; *Lautzenheiser,* 180 Ariz. at 9, 881 P.2d at 341.  Here the trial court did not expressly order further deliberations, but rather did so implicitly by repeatedly offering assistance to the jury.  Thus, while the trial court's actions here were not as overt as in the earlier cases, the court's comments focusing on the holdout juror conveyed the implicit message the court thought the holdout juror should change his view.  *McCutcheon I,* 150 Ariz. at 320, 723 P.2d at 669.

14

"insulting" to the jurors to presume that any juror felt compelled to convict. We disagree because the trial judge twice expressly singled out the holdout juror by first asking the holdout juror to list specific issues that he had a problem with, and then subsequently asking that juror what he may want reargued. Under these circumstances, we believe any admonition from the court that it was not trying to coerce a verdict was a hollow gesture at best.[5]

**D.**

¶25 As discussed earlier, issues of jury coercion are decided based on the totality of the circumstances. *McCrimmon,* 187 Ariz. at 172, 927 P.2d at 1301. The trial court violated Rule 22.4 when it gave the recommended impasse instruction before the jury indicated it had reached an impasse. Such an action signaled the jury that it was taking too long to reach a verdict. More significantly, the court's subsequent directions to the jury had the effect of twice suggesting that the holdout juror should reconsider his position, despite being told twice that the juror's

---

[5] This court has recommended advising jurors not to give up their honestly held beliefs "whenever further deliberations are ordered." *State v. McCutcheon,* 162 Ariz. 54, 60, 781 P.2d 31, 37 (1989) (*McCutcheon II*). The trial court here never gave such an instruction when it gave the additional instructions to the jury. However, a trial court's failure to give such an instruction is not fundamental error. *Id.; Roberts,* 131 Ariz. at 518, 642 P.2d at 862. Nevertheless, the better practice is for trial courts to consistently remind jurors not to surrender their honestly held beliefs whenever a court offers assistance during deliberations.

mind was made up.  Given these circumstances, we conclude the trial court's actions "displaced the independent judgment of the jurors." *Id.* (quoting *McCutcheon I,* 150 Ariz. at 320, 723 P.2d at 669). Accordingly, we must remand this case for a new trial.

**III.**

¶26     Although we reverse and remand for a new trial because the jury verdict was coerced, we find it necessary to address several issues that may arise at retrial.

**A.**

**1.**

¶27     At trial, Huerstel introduced statements from two inmates who claimed that Prasertphong had told them he had shot all three of the victims.  In rebuttal, over objection, the State presented Prasertphong's confession to the police in which he claimed Huerstel did all the shooting.[6]  Huerstel claims error in the introduction of Prasertphong's statement.  Under the facts of this case, we agree.

¶28     Arizona Rule of Evidence 806 permits a party to attack a

---

[6]     The court redacted portions of Prasertphong's confession and allowed a detective, who was present during the confession, to read the redacted version to the jury.  The trial court granted some of Huerstel's requests to use portions of Prasertphong's testimony at the suppression hearing, and some of his statements to the police as "re-direct" testimony.  Huerstel's counsel also questioned the detective at length about Prasertphong's testimony at the suppression hearing, at which Prasertphong alleged the detectives made threats and promises to get him to confess and also coached him throughout the interrogation.

16

hearsay statement admitted into evidence with "any evidence which would be admissible for those purposes if [the] declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." Ariz. R. Evid. 806. While Prasertphong's statement may have been admissible under Rule 806 as an inconsistent statement, that does not end the inquiry.

¶29 This court has expressly held that the admissibility of evidence under a hearsay exception does not negate consideration of the Confrontation Clause. *State v. Bass,* 198 Ariz. 571, 580, ¶ 35, 12 P.3d 796, 805 (2000) ("[T]he hearsay rule and confrontation clauses are not duplicates. [Citations omitted.] The confrontation clauses apply uniquely to the defendant in criminal cases to ensure that testimony of an out-of-court declarant may be given only where it is invested with 'particularized guarantees of trustworthiness.'" (quoting *Ohio v. Roberts,* 448 U.S. 56, 66 (1980))). The Confrontation Clause protects the right to a fair trial by requiring that the defendant have an opportunity to confront any witness who testifies against him. *Id.* at 580, ¶ 35, 12 P.3d at 805. It permits the hearsay testimony of an unavailable witness only if it is considered inherently reliable or is proven reliable based on the circumstances. *Id.*

17

¶30     Analysis under the Confrontation Clause requires consideration of two factors.  First, the witness must be unavailable, and second, the basis for admission of the hearsay testimony must be a "firmly rooted" hearsay exception, or the testimony must possess such indicia of reliability that it passes constitutional muster.  *Roberts,* 448 U.S. at 66.  The trial court found that Prasertphong was an unavailable witness.  However, the court failed to consider whether the hearsay statement either fell within a firmly rooted hearsay exception or possessed the necessary indicia of reliability.

¶31     One court has held that Rule 806 is a firmly rooted exception to the hearsay rule.  *Longfellow v. State,* 688 A.2d 1370, 1373 (Del. 1997).  However, the determination of whether an exception is firmly rooted "for Confrontation Clause purposes is a question of federal law."[7]  *Lilly v. Virginia,* 527 U.S. 116, 125 (1999) (plurality opinion).

¶32     In *Lilly*, the Court held that "a hearsay exception [is] firmly rooted if, in light of longstanding judicial and legislative experience it rest[s] [on] such [a] solid foundatio[n] that admission of virtually any evidence within [it] comports with the substance of the constitutional protection." *Id*. at 126 (Citations

---

[7]     Although *Longfellow* opines that Rule 806 is firmly rooted under state and federal law, 688 A.2d at 1373, the case cites no authority for the proposition and appears to be the only case so holding.

and internal quotation marks omitted.) Rule 806 has an extremely broad scope. It permits the introduction of "any evidence which would be admissible" for the purpose of attacking the hearsay declarant's credibility. Ariz. R. Evid. 806. But it goes too far to say that "virtually any evidence" admitted within the broad scope of Rule 806 would "comport[] with the substance of the constitutional protection" afforded by the Confrontation Clause. *Lilly,* 527 U.S. at 126.

¶33 Although not addressing Rule 806, the *Lilly* plurality held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." *Id.* at 134. Moreover, a number of other Supreme Court cases have held that exculpatory statements of accomplices taken during custodial interrogations that inculpate a co-defendant are inherently unreliable. *See, e.g., Williamson v. United States,* 512 U.S. 594, 599-600 (1994); *Lee v. Illinois,* 476 U.S. 530, 540-41 (1986); *Bruton v. United States,* 391 U.S. 123, 124-25 (1968); *Douglas v. Alabama,* 380 U.S. 415, 419-20 (1965).

¶34 Consequently, because Rule 806 is not a firmly rooted exception, the trial court was obligated to find that the statement at issue bore sufficient "indicia of reliability" before allowing the statement to be used. *Roberts*, 448 U.S. at 66. But nothing in the record indicates such a finding was made. We conclude that Prasertphong's confession is unreliable because it tended to place

19

all the blame on Huerstel and minimized Prasertphong's culpability. *See Williamson,* 512 U.S. at 599-600.

¶35 The State raises two arguments against finding a Confrontation Clause violation. The State first argues that Huerstel opened the door to Prasertphong's statement by introducing hearsay testimony from Prasertphong. Second, the State argues that the testimony was admissible under the rule of completeness. *See* Ariz. R. Evid. 106. Neither argument finds support in the law.

¶36 The State does not cite a case directly supporting the "opening the door" proposition.[8] We find persuasive two decisions contrary to the State's position. Those decisions held that the admissibility of evidence under Rule 806 does not obviate the trial court's obligation to consider the Confrontation Clause. *Longfellow,* 688 A.2d at 1372; *State v. Lemons,* 530 S.E.2d 542, 547 (N.C. 2000), *cert. denied*, 531 U.S. 1091 (2001). Thus, the State's "opening the door" argument fails.

---

[8] The State cites *United States v. Nobles,* 422 U.S. 225 (1975), on this point. However, *Nobles* dealt with the appropriate sanction for violation of a discovery order. *Id.* at 228-29; *see, e.g., Michigan v. Lucas,* 500 U.S. 145, 151-53 (1991) (citing *Nobles* for the proposition that probative evidence may be excluded when a criminal defendant fails to comply with a valid discovery order); *Taylor v. Illinois,* 484 U.S. 400, 414 (1988) (citing *Nobles* in support of its holding that the trial court may preclude testimony of a witness as sanction for failure to disclose that witness in violation of discovery order); *United States ex rel. Enoch v. Lane,* 581 F. Supp. 423, 430-31 (N.D. Ill. 1984). Although some of the language in the decision supports the State's argument, the decision is not based on the Confrontation Clause and is factually distinguishable from the present case.

¶37     The State relies on *State v. Soto-Fong,* 187 Ariz. 186, 192, 928 P.2d 610, 616 (1996), to support its argument that the "rule of completeness" should permit introduction of Prasertphong's statement.  In *Soto-Fong,* the testifying witness related hearsay statements from Soto-Fong's two co-defendants.  *Id.*  The witness had spoken to the co-defendants on a single occasion about their involvement in a murder.  *Id.*  He subsequently told the police about a portion of that conversation that tended to exculpate Soto-Fong.  *Id.*  Months later, the witness told the police about another portion of that same conversation that tended to inculpate Soto-Fong.  *Id.*  Soto-Fong had sought to introduce the first part of the hearsay statement but at the same time preclude the state from introducing the second part because it was not self-inculpatory as to the declarants.  *Id.* at 193, 928 P.2d at 617.  The trial court ruled that if Soto-Fong introduced the first part of the statement, the state would be permitted to introduce the second part.  *Id.* This court affirmed that decision.  *Id.* at 194, 928 P.2d at 618.

¶38     We find *Soto-Fong* distinguishable for the following reasons.  First, the two separate statements in *Soto-Fong* related to a single conversation the witness had with the hearsay declarants.  *Id*. at 192, 928 P.2d at 616.  This case involves completely separate conversations:  two with different inmates and another with the police during a custodial interrogation. Permitting testimony related to an entirely separate conversation

21

does nothing to complete the other conversation.

¶39	Second, in *Soto-Fong,* it was impossible to conclude that the witness's second statement was unreliable without concluding the same about the first statement because both statements were made by the witness to the police "with an eye to obtaining a deal with the government." *Id.* at 195 n.4, 928 P.2d at 619 n.4.

¶40	Finally, the statement Soto-Fong sought to introduce was arguably inadmissible hearsay because it was not sufficiently self-inculpatory with regard to the hearsay declarants. *Id.* at 193, 928 P.2d at 617. The statement of Soto-Fong's co-defendants that he wanted to admit as evidence named a third person as one of the murderers. *Id.* at 193-94, 928 P.2d at 617-18. In contrast, the inmate statements Huerstel introduced were admissible because Prasertphong admitted in those statements that he was solely responsible for the killings. *See* Rule 804(b)(3). But Prasertphong's confession to the police placed most of the blame for the murders on Huerstel. As discussed earlier, admission of such a statement directly implicates the Confrontation Clause. Consequently, neither of the State's arguments for avoiding the application of the Confrontation Clause is convincing.

¶41	Because Prasertphong's hearsay statement to the police blaming Huerstel for the murders neither fell within a firmly rooted hearsay exception nor bore sufficient indicia of reliability, its admission violated Huerstel's Confrontation Clause

22

rights.

**2.**

¶42    At retrial, if the State again seeks to admit Prasertphong's statement to the police, the trial court may admit the statement only for the limited purpose of impeachment. *See, e.g., Tennessee v. Street,* 471 U.S. 409, 414, 417 (1985) (holding testimony that would violate the Confrontation Clause if introduced for the truth may nonetheless be admissible if offered for the limited purpose of impeachment)*; Martinez v. McCaughtry,* 951 F.2d 130, 133 (7th Cir. 1991). The express purpose of Rule 806 is to allow a party to attack the "credibility" of the hearsay declarant. *See* Ariz. R. Evid. 806. By its terms, the rule's limited purpose is impeachment. But to satisfy the Confrontation Clause, if the trial court decides to permit the introduction of Prasertphong's statement to the police, the court must instruct the jury as to the limited purpose for which Prasertphong's statement is introduced.[9]

---

[9]    We note that this court has held that when prior inconsistent statements are admitted, "such statements may be used substantively as well as for impeachment." *State v. Acree,* 121 Ariz. 94, 97, 588 P.2d 836, 839 (1978). *Acree* predicated the substantive use of a prior inconsistent statement on the fact that the witness who made the statement testified at trial and was available for cross-examination. *Id.* Because Prasertphong was not available as a witness, *Acree* would not apply here. Rule 806 appears to instruct courts to entertain the fiction that the hearsay declarant has in fact testified. Ariz. R. Evid. 806 ("[T]he credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes *if the declarant had testified as a witness.*" (Emphasis added.)). Had Prasertphong testified, his prior inconsistent statement would have

23

*See, e.g., State v. Sego,* 629 A.2d 1362, 1365-66 (N.J. Super. Ct. App. Div. 1993); *Tennessee v. Zirkle,* 910 S.W.2d 874, 891 (Tenn. 1995). Although Prasertphong's statement may be admissible for the purpose of impeachment, at retrial the trial court should carefully consider whether the prejudicial effect of its admission may outweigh its probative value. *See* Ariz. R. Evid. 403.

**B.**

¶43    Huerstel raises numerous arguments as to the voluntariness of his confessions to the police.  His first confession was given to the police detectives the evening of his arrest, the second to Sergeant Acorn at the jail the following morning.  We hold that neither confession was involuntary.

**1.**

¶44    Huerstel was seventeen years old at the time of his confessions.  Detectives Olivas and Charlton conducted the initial interrogations.  They advised Huerstel of his *Miranda*[10] rights, and he waived them.  The first interrogation lasted fifteen minutes and was tape recorded.  Huerstel apparently remained handcuffed the

---

been admissible both as impeachment and as substantive evidence. Ariz. R. Evid. 801(d)(1)(a); *Acree,* 121 Ariz. at 97, 588 P.2d at 839.  However, extending Rule 806 to an accomplice's hearsay statement inculpating a co-defendant creates a Confrontation Clause problem.  Therefore, evidence admitted under Rule 806 in a criminal case should be admitted only for the limited purpose of impeachment.

[10]    *See Miranda v. Arizona,* 384 U.S. 436 (1966).

24

entire time.  Huerstel denied being at the Pizza Hut the previous night.  Instead, he claimed to have been at a billiard hall.

¶45        The detectives concluded the interview and proceeded to question Prasertphong.  In the interim, Huerstel was taken out of the interview room and kept in a nearby office.

¶46        Following their interrogation of Prasertphong, the detectives had Huerstel brought back into the room.  Huerstel claimed that before resuming their questioning, the detectives stood in the hallway and spoke loudly about Huerstel taking the whole "rap" for the crime and that he would get the death penalty.

¶47        When the detectives came back into the room, their initial interaction with Huerstel before renewing the interview was not tape recorded.  The detectives claimed they had a short conversation with Huerstel and played a portion of Prasertphong's confession for him.  Huerstel alleged that the detectives said they would go over to his house, handcuff his family, put them on the ground, and hold guns to their heads unless Huerstel told them where the clothes he was wearing the night of the murders were. The detectives denied all of Huerstel's allegations.

¶48        During the taped portion of the second interrogation, Huerstel confessed to his involvement in the crimes.[11]  Huerstel was

---

[11]    At trial, Huerstel claimed he was not involved in the shootings, rather that he lied to the police about his involvement because he feared what Prasertphong might do to him or his family if he told anyone Prasertphong was involved in the murders.

then transported to jail where he was placed on a five-minute suicide watch.

¶49    The following morning, Sergeant Acorn, the jail facility supervisor, asked to speak to Huerstel in his office. Acorn testified that Huerstel was brought to the office complaining of feeling sick to his stomach. Once in the office, Huerstel told Acorn about his involvement in the murders. Huerstel's statement was consistent with what he had told the detectives the evening before. Before speaking to Huerstel, Acorn did not advise him of his *Miranda* rights.

**2.**

¶50    "We start with the presumption that confessions resulting from custodial interrogation are inherently involuntary; to rebut that presumption, the state must show by a preponderance of the evidence the confession was freely and voluntarily made." *State v. Jimenez,* 165 Ariz. 444, 448-49, 799 P.2d 785, 789-90 (1990) (citations omitted). "When a juvenile confession occurs as a result of police questioning, the 'greatest care must be taken to assure that the admission was voluntary.'" *Id.* at 449, 799 P.2d at 790 (quoting *In re Gault,* 381 U.S. 1, 55 (1967)). In determining whether a confession was voluntary, this court considers the totality of the circumstances. *Id.* at 449, 799 P.2d at 790. We

---

Huerstel also claimed the police threatened him and made promises of leniency during his interrogation.

26

review the trial court's determination of voluntariness for abuse of discretion. *State v. (Antoin) Jones,* 203 Ariz. 1, 5, ¶ 8, 49 P.3d 273, 277 (2002), opinion supplemented by ___ Ariz. ___, 72 P.3d 1264 (2003).

**¶51** A confession may be found involuntary based on any of the following factors: "(1) impermissible police conduct, (2) coercive pressures that are not dispelled, or (3) a confession derived directly from a prior involuntary statement." *State v. Amaya-Ruiz,* 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990) (citation omitted).

**a.**

**¶52** On appeal, Huerstel first complains that Detectives Olivas and Charlton did not let him speak to his parents. While the tape recorder was on, Huerstel asked once to call his parents, and he contended he asked to do so a total of five times before giving his confession. But the absence of a parent during the questioning of a juvenile does not itself render a confession involuntary, rather it is considered as a factor in the totality of the circumstances analysis.[12] *Jimenez,* 165 Ariz. at 450-51, 799 P.2d at 791-92; *State v. Scholtz,* 164 Ariz. 187, 188-89, 791 P.2d 1070, 1071-72 (App. 1990).

---

[12] Nor is a request for a parent considered the functional equivalent of a request for counsel. *See Fare v. Michael C.* 442 U.S. 707, 724 (1979) (holding a juvenile's request to speak to a probation officer is not a per se invocation of Fifth Amendment rights).

¶53     Huerstel cites *United States v. Wendy G.,* 255 F.3d 761, 767-68 (9th Cir. 2001), for the proposition that a juvenile's confession to police is involuntary when the police fail to notify the juvenile's parents.  But that case explicitly held there was no constitutional violation; rather the court relied solely on a federal statute that requires parental notification.  *Id.*  Federal statutory law does not apply to this case.

¶54     Huerstel next complains that the detectives repeatedly lied to him to secure a confession.  During the first interrogation session, the detectives told Huerstel, among other things, that they had physical evidence linking him to the Pizza Hut when in fact they did not have such evidence.  Such tactics by the police are permissible so long as the suspect's will is not overborne.  *State v. Carrillo,* 156 Ariz. 125, 136, 750 P.2d 883, 894 (1988).  That Huerstel maintained his innocence throughout the fifteen minutes of initial questioning, despite the detectives' misrepresentations about the evidence, demonstrates that his will was not overborne.

¶55     Huerstel also claims the detectives induced his confession with promises of leniency by telling him it would be better for him to tell the truth.  Although confessing was not "better" for Huerstel, this court has held that such advice from the police "when unaccompanied by either a threat or promise does not render a subsequent confession involuntary."  *Amaya-Ruiz,* 166

28

Ariz. at 165, 800 P.2d at 1273 (citations omitted).

¶56     Additionally, Huerstel asserts the detectives threatened him "off-tape" during his interrogation in a number of ways.[13] Detective Olivas testified that he did not threaten Huerstel. Although Detective Charlton testified he made no threats regarding the death penalty, during a defense deposition he said he could not remember whether he made such a threat. Nonetheless, the trial court did not find Huerstel's assertions credible.

¶57     Because this case involves a juvenile confession, when applying the totality of the circumstances analysis, this court must consider that juveniles may be more susceptible to certain police tactics than adults and as such their will may be more easily overborne. *Jimenez,* 165 Ariz. at 449, 799 P.2d at 790. Courts consider the "juvenile's age, experience, education, background, and intelligence" in evaluating the voluntariness of a juvenile's confession. *Fare v. Michael C.,* 442 U.S. 707, 725 (1979).

¶58     Huerstel was a seventeen-year-old high school student of slightly below average intelligence. He had only one previous police encounter involving a curfew violation. However, nothing in

---

[13]     The trial court chastised the officers for having unrecorded conversations. We share the trial court's concern and again strongly urge that the police record their interrogations of suspects in their entirety. *See Jones,* 203 Ariz. at 7, ¶ 18, 49 P.2d at 279.

29

his background demonstrates that he was incapable of understanding his rights or waiving them. The trial court found Huerstel's confession notable for its lack of emotional content, inferring that his maturity was such that he understood his rights. Moreover, the trial court did not find Huerstel's allegations of threats or promises of leniency credible.

¶59 Because the trial court's decision rested almost entirely on an assessment of Huerstel's and the detectives' credibility, and sufficient evidence supports its findings, we cannot say the trial court abused its discretion in finding Huerstel's statement to the detectives voluntary. *State v. Jerousek,* 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979).

### b.

¶60 Huerstel also claims his confession to Sgt. Acorn at the jail the morning after his arrest was involuntary. He argues that Sgt. Acorn held himself out as mental health advisor when he took Huerstel's statement. Huerstel further argues he was not given his *Miranda* warnings before making the statement.

¶61 The trial court ruled that although Sgt. Acorn failed to give Huerstel his *Miranda* warnings, the statement was nonetheless given without violating traditional standards of voluntariness. *State v. Walker,* 138 Ariz. 491, 495, 675 P.2d 1310, 1314 (1984). Acorn's testimony was presented in rebuttal. This court has held that a voluntary confession obtained in violation of *Miranda* may be

30

used to impeach a witness. *Id.* Consequently, even though Huerstel's *Miranda* rights were violated, on retrial the confession to Acorn would be admissible as impeachment.

¶62 While Huerstel now claims his confession was coerced because Acorn held himself out to be a mental health advisor, he made no such claim at the voluntariness hearing. In fact, he denied ever making a statement to Acorn. No testimony at the voluntariness hearing asserted that Acorn was a mental health advisor or evaluator. Testimony related to Acorn's duties at the jail came out during trial.[14] In reviewing the voluntariness of a statement, we consider only the evidence presented at the voluntariness hearing and nothing presented at trial. *State v. Flower,* 161 Ariz. 283, 286 n.1, 778 P.2d 1179, 1182 n.1 (1989).

¶63 Finally, Huerstel challenges the admissibility of his confession to Acorn on the ground that having Huerstel brought to Acorn's office to talk was "an action on the part of police reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980). But the issue in *Innis* concerned whether the defendant was interrogated for *Miranda* purposes. *Id.* at 298. The trial court determined that Acorn conducted an interrogation, and because of that, Huerstel's *Miranda*

---

[14] That testimony only indicated Acorn was responsible for the physical and mental well-being of the prisoners; he made no statement that he was a mental health advisor or therapist of any kind.

rights were violated. The trial court nonetheless held the confession was voluntary, a conclusion that the record supports, making the confession admissible as impeachment evidence.

## C.

¶64     Huerstel argues very generally that the jury should not have been allowed to hear the questions detectives asked him during his confession when the tape of that confession was played. During a hearing on the matter, the court redacted much of what Huerstel had asked to be removed.

¶65     On appeal, Huerstel fails to specify any particular additional question by the police that should have been excluded. Rather he appears to find fault in the fact that the jury heard any of the police questions. But juries that are permitted to hear taped confessions are also permitted to hear the questions police ask. *State v. Miller,* 186 Ariz. 314, 322, 921 P.2d 1151, 1159 (1996) (finding questions not offered for truth but to establish fact of questioning); *State v. Ceja,* 113 Ariz. 39, 42, 546 P.2d 6, 9 (1976) (finding questions offered only for their effect on the hearer); *State v. Weigel,* 145 Ariz. 480, 481, 702 P.2d 709, 710 (App. 1985) (finding questions offered merely to give interrogation context). The trial court did not err in allowing the jury to hear the questions posed by the detectives.

## D.

32

¶66     Evidence presented by the State showed that a few days before the murders in this case, Huerstel had spoken to two friends at school about his intention to rob an AutoZone on the weekend of the murders.  At trial, Huerstel denied ever making such comments.

¶67     Before trial, Huerstel filed a motion in limine arguing that, under Arizona Rule of Evidence 404(b), "any evidence relating to an AutoZone" should be precluded.  At a hearing on the motion, the court ruled that "[t]he evidence concerning the AutoZone 'bad act' [did] not rise to a preponderance of the evidence much less to the level of clear and convincing evidence."  But when the State offered the testimony of Huerstel's friends at trial, the court ruled that although such testimony was not admissible under Rule 404(b), it was admissible under Rule 803(3), as evidence of Huerstel's then-existing state of mind.  Huerstel first claims Rule 803(3) was not the appropriate hearsay exception.

¶68     Huerstel's contention that the testimony was inadmissible under Rule 803(3) is incorrect.  Rule 803(3) permits the admission of a "statement of the declarant's then existing state of mind . . . (such as intent, plan, [or] motive)."  Ariz. R. Evid. 803(3).  Huerstel's statements to his high school friends were clearly statements of a plan or intent.

¶69     Huerstel next contends the testimony was not admissible under Rule 803(3) because "none of the hearsay exceptions provide any relief from the limitations on relevance under Rules 401-411."

33

Huerstel appears to argue that the testimony was not admissible under Rule 803(3) because it was not also admissible under Rule 404(b). Huerstel cites no case in support of this contention. This argument is meritless because Rule 404(b) concerns conduct and Rule 803(3) concerns statements. Huerstel argues that planning a robbery is conduct. However, the AutoZone testimony was not evidence of Huerstel's conduct, but evidence of what he said. As such, Rule 803(3) controls the inquiry.[15]

¶70    Huerstel finally argues that the testimony was used to show his intent and that it was not admissible for that purpose because his intent was never an issue in the case. The issue of the admissibility of the AutoZone testimony was twice argued before the trial court and on neither occasion did Huerstel specifically argue the intent issue. Thus, the argument is waived. *State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991).

**E.**

¶71    Huerstel claims the trial court unfairly permitted the State to impeach his trial testimony with statements he made during the voluntariness hearing. Huerstel alleged at the voluntariness hearing his confession to the detectives was invalid because he was

---

[15]    Huerstel repeats his argument that this was evidence of a prior bad act by arguing that the trial court erred in refusing to give the jury a "prior bad act" instruction. Because the evidence was admitted under Rule 803(3) as evidence of Huerstel's then existing state of mind, a jury instruction on the use of prior bad act evidence would have been wholly irrelevant.

intimidated and threatened by them. However, at trial, Huerstel also alleged he confessed because he feared reprisals from Prasertphong. The State sought to point out that inconsistency.

¶72 Huerstel argues that the sole purpose of the voluntariness hearing was to evaluate police misconduct to determine if the State had violated Huerstel's rights. Huerstel claims Prasertphong was not mentioned during the voluntariness hearing because any intimidation or coercion by him would have been irrelevant. Thus, the State's questioning him about his failure to mention Prasertphong's threats during the voluntariness hearing misled the jury and violated his rights under the Sixth and Fourteenth Amendments.

¶73 The court overruled Huerstel's objection to this line of questioning at trial, reasoning that the subject of the pre-trial hearing was the voluntariness of Huerstel's confession and that the confession could have been coerced by the police or Prasertphong. But under *Colorado v. Connelly,* 479 U.S. 157, 165 (1986), a confession is involuntary only if it results from coercive activity by the state. *See, e.g., State v. Poyson,* 198 Ariz. 70, 75, ¶ 10, 7 P.3d 79, 84 (2000), *cert. denied*, 531 U.S. 1165 (2001) (citing *Connelly*); *State v. Lee,* 189 Ariz. 590, 601, 944 P.2d 1204, 1215 (1997) (same). Moreover, *Connelly* held that "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due

35

Process Clause." 479 U.S. at 166. Consequently, any threats by Prasertphong to coerce Huerstel into confessing would have been irrelevant at the voluntariness hearing in assessing the voluntariness of Huerstel's confession unless the police had known of those threats and exploited them. *See id.* at 164-65. Therefore, the trial court erred in ruling that the State could question Huerstel about his failure to testify at the voluntariness hearing about Prasertphong's alleged threats.

**F.**

¶74        Huerstel raises a number of claims related to the jury instructions in this case. We find it unnecessary to address them because the claims he raises are either meritless or largely dependent upon the evidence that will be developed at retrial.[16]

**IV.**

¶75        We reverse Huerstel's convictions and sentences on all counts and remand the case for a new trial.

_____
                    Michael D. Ryan, Justice

CONCURRING:

_____

    [16]     Because we reverse Huerstel's convictions, we also decline to address any sentencing issues.

36

_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Rebecca White Berch, Justice


_____
Cecil B. Patterson, Jr., Judge* (Retired)


* Justice Andrew D. Hurwitz recused himself from this case. Judge Cecil B. Patterson, Jr., of the Arizona Court of Appeals, Division One, was designated to sit in his place pursuant to Article 6, Section 3, of the Arizona Constitution.