SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No.  CR-07-0301-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No.  CR 2005-138481 |
| RYAN WESLEY KUHS, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Paul J. McMurdie, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel, Criminal
          Appeals/Capital Litigation Section
          Susanne Bartlett Blomo, Assistant Attorney General
Attorneys for State of Arizona

MICHAEL S. REEVES, ESQ.                                    Phoenix
     By   Michael S. Reeves

And

STEPHEN M. JOHNSON, P.C.                                   Phoenix
     By   Stephen M. Johnson
Attorneys for Ryan Wesley Kuhs
_____

**B E R C H**, Chief Justice

¶1      A  jury  convicted  Ryan  Wesley  Kuhs  of  first  degree
burglary and first degree murder and determined that he should
be  sentenced  to  death.   In  this  automatic  appeal,  Kuhs  raises

seven issues.[1]  Ariz. R. Crim. P. 31.2(b).  We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) § 13-4031 (2001).

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

¶2         In 2005, Ryan Kuhs entered Enrique Herrera's apartment and stabbed him while he slept.  Herrera awoke and attempted to defend himself.  During the struggle, Kuhs stabbed Herrera twenty-one times.

¶3         Three residents of the apartment complex saw Kuhs leave Herrera's apartment with blood on his shirt and arms.  They entered Herrera's apartment, saw Herrera lying in a pool of blood, and called 911.  Herrera died later that day after being taken to the hospital.

¶4         Kuhs went to another apartment, cleaned himself up, changed clothes, and left the apartment complex with his bloody clothes in a bag.  When he returned later that afternoon, he was arrested.

¶5         After being given *Miranda* warnings, Kuhs agreed to talk to the police and eventually confessed to the killing.  Kuhs said that he went to Herrera's apartment to confront him about

---

[1]    He lists thirteen additional challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion.  Those thirteen claims are appended to this opinion.

[2]    We view the facts in the light most favorable to sustaining the verdict.  *State v. Moore*, 222 Ariz. 1, 5 n.1 ¶ 2, 213 P.3d 150, 154 n.1 (2009).

an argument between the two the previous night.

¶6     The jury convicted Kuhs of first degree burglary and first degree murder.  The jury found five aggravating factors: (1) a prior conviction for a serious offense based on the first degree burglary from this prosecution, A.R.S. § 13-751(F)(2) (Supp. 2009); (2) a second prior conviction for a serious offense based on a second degree burglary, A.R.S. § 13-751(F)(2); (3) the especially heinous, cruel, or depraved manner of the murder, A.R.S. § 13-751(F)(6); (4) the commission of the murder while on release from prison, A.R.S. § 13-751(F)(7)(a); and (5) the commission of the murder while on probation for a prior felony, A.R.S. § 13-751(F)(7)(b).

¶7     The jury found that the mitigation was not sufficiently substantial to call for leniency and that the death penalty should be imposed.  The court sentenced Kuhs to death for the first degree murder and to a concurrent term of twenty-eight years for the burglary.

## II.  DISCUSSION

### A.  Guilt Phase

#### 1.  Kuhs's competency

¶8     Kuhs argues that the trial court erred by finding him competent to stand trial without holding an evidentiary hearing. We review the trial court's determination of whether to require an evidentiary hearing on competency for abuse of discretion.

*See State v. Amaya-Ruiz*, 166 Ariz. 152, 162, 800 P.2d 1260, 1270 (1990).

¶9	In January 2006, Kuhs requested a prescreening examination pursuant to Arizona Rule of Criminal Procedure 11.2(c), alleging that he was experiencing hallucinations. After that preliminary examination, the court ordered a full Rule 11 evaluation. *See* Ariz. R. Crim. P. 11.2(d).

¶10	During the evaluation process, Drs. Jack Potts and Scott Sindelar independently examined Kuhs and both found him incompetent to stand trial. They noted that he claimed to experience auditory and visual hallucinations in which God spoke to him. They opined, however, that Kuhs could be restored to competency.

¶11	Based on the doctors' reports, the trial court found Kuhs incompetent to stand trial and ordered him committed to the Maricopa County Correctional Health Services Restoration Program. The trial court ordered a written report on Kuhs's "progress and prognosis."

¶12	While in the restoration program, Kuhs was evaluated by Dr. Jason Lewis, who submitted a report concluding that Kuhs had feigned his earlier reported psychosis and was competent to stand trial. Dr. Lewis's report detailed Kuhs's understanding of the charges against him as well as the trial process and its participants. The prosecutor and defense counsel stipulated

that the court could assess Kuhs's competency based on Dr. Lewis's report. At a July 11, 2006 hearing, the judge found Kuhs competent to stand trial based on "a review of that [July 4] final report as well as the pleadings filed pursuant to Rule 11."

¶13 A defendant has a due process "right not to be tried or convicted while incompetent." *Amaya-Ruiz*, 166 Ariz. at 161, 800 P.2d at 1269 (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). Arizona Rule of Criminal Procedure 11.2 protects that right by providing for a prescreening examination and hearing if reasonable grounds exist to question the accused's competence. "Reasonable grounds exist when 'there is sufficient evidence to indicate that the defendant is not able to understand the nature of the proceeding against him and to assist in his defense.'" *Id.* at 162, 800 P.2d at 1270 (quoting *State v. Borbon*, 146 Ariz. 392, 395, 706 P.2d 718, 721 (1985)); *see also* Ariz. R. Crim. P. 11.1 (prohibiting trial of a person who "is unable to understand the proceedings against him or her or to assist in his or her own defense").

¶14 If the court has determined that an incompetent defendant is restorable to competency, the court must "order the person supervising defendant's court-ordered restoration treatment to file a report with the court." Ariz. R. Crim. P. 11.5(d). When the court receives a report that the defendant

has become competent to stand trial, "[t]he court shall hold a hearing to redetermine the defendant's competency" at which the parties may "introduce other evidence regarding the defendant's mental condition" or "submit the matter on the experts' reports." *Id.* R. 11.6(a), 11.5(a).

¶15 Kuhs complains that he was denied the hearing required by Rules 11.5 and 11.6 because the court allowed "the parties [to] stipulate[] to competency," and by doing so, the court violated its duty "to conduct a competency hearing" and "to make an independent inquiry to determine [whether Kuhs] was competent to stand trial."

¶16 Counsel, however, did not stipulate to competency. Instead, they stipulated to the admissibility of Dr. Lewis's report and presented no other evidence regarding Kuhs's competency. In finding that Kuhs had been restored to competency, the trial court stated that it had reviewed Dr. Lewis's "final report as well as the pleadings filed pursuant to Rule 11." Because the same judge had presided over the initial Rule 11 proceeding, the court was familiar with the reports previously submitted by Drs. Potts and Sindelar. On this record, we conclude that the trial court did not abuse its discretion in making its competency determination without holding an evidentiary hearing.

2.  Denial of motion for mistrial

¶17      During the State's guilt phase closing argument, the victim's stepmother cried audibly.  After the prosecutor concluded her closing argument, Kuhs moved for a mistrial, which the court denied.  Kuhs now claims that the court erred in denying his motion.

¶18      We review the denial of a motion for mistrial for abuse of discretion.  *State v. Hoskins*, 199 Ariz. 127, 142 ¶ 52, 14 P.3d 997, 1012 (2000).  "This deferential standard of review applies because the trial judge is in the best position to evaluate 'the atmosphere of the trial, the manner in which the objectionable statement was made, and the possible effect it had on the jury and the trial.'"  *State v. Bible*, 175 Ariz. 549, 598, 858 P.2d 1152, 1201 (1993) (quoting *State v. Koch*, 138 Ariz. 99, 101, 673 P.2d 297, 299 (1983)).

¶19      Although Kuhs characterizes the disruption as a "raucous outburst," the record does not contain any direct evidence of the disruptiveness of the incident.  During the State's closing argument, the court asked the prosecutor to pause, apparently in reaction to the occurrence.  The only other reference to the event in the record is the discussion between the court and counsel held outside the jury's presence after the

prosecutor's closing argument.[3]

_____

[3]    After the State's closing argument, the following exchange took place:

DEFENSE COUNSEL:  I think we need to address what happened right at the tail end of the State's close, their first close.  I think we fought a pretty clean trial, but that outburst at the end of the State's close — I know we tell the jury not to be swayed by sympathy or passion, but then we have a wailing woman at the end of the State's close.

I think a mistrial is in order now.  If the Court is not inclined to grant that mistrial, then I would ask that you instruct the victims — I understand this is a trying time for them, but if they cannot control themselves, that they need to leave the courtroom.

THE COURT:  All right.  Does the State wish to be heard?

THE STATE:  Your Honor, obviously the State didn't know that was going to happen.

The victims [the deceased's father and stepmother] have generally come to trial.  They have not shown one iota of inappropriate or even emotion at all, including when [the stepmother] testified.

So it's not too hard to understand why Ricky's stepmother would become extremely upset upon seeing this. . . .  [M]y victim advocate[] has spoken to the family, and they understand the importance of keeping their composure and have agreed if they cannot do that, they will leave the court.

THE COURT: All right.  Just so the record is clear, I agree with the assessment that the next of kin, who were in my line of sight throughout the entire proceedings, have not acted in any inappropriate fashion whatsoever.

There was a point towards the end of the State's opening argument where one of them burst into tears.  I immediately instructed the bailiff to escort the

¶20    On this record, we cannot conclude that the trial court inaccurately assessed the situation or abused its discretion in denying Kuhs's motion for mistrial.  We previously have found that more substantial emotional outbursts in the jury's presence did not mandate a mistrial.  In *State v. Bible*, 175 Ariz. at 597, 858 P.2d at 1200, for example, as the father of a murdered girl walked out of the courtroom, he referred to the defendant as "[t]hat f[***]ing asshole" within earshot of the judge and jury.  The judge admonished the jury to disregard the outburst, *id.*, and denied the defendant's motion for mistrial, explaining: "I don't think it's really the substance for a mistrial.  I don't think there is any doubt in the jury's mind about how [the victim's father] feels about [the defendant]." *Id.* at 597–98, 858 P.2d at 1200–01 (first alteration in original).  We emphasized that "the victim's father had taken no action at trial warranting reprimand or comment prior to his outburst" and "[n]o information was conveyed other than the father's animosity toward Defendant, a feeling that could hardly have surprised the jurors." *Id.* at 599, 858 P.2d at 1201.

¶21    Similarly, Herrera's stepmother's tears did not convey any new information to the jury.  When she "burst into tears," she was immediately escorted from the courtroom.  The court had

woman out of the courtroom, which she did.  I don't think a mistrial is appropriate at this point, so the motion for mistrial is denied.

no indication before the incident that she would respond in such a fashion. She had behaved appropriately throughout the trial, even during her own testimony. Finally, the trial court took immediate and appropriate action to prevent repetition of the incident by addressing the gallery outside the jury's presence and directing observers to avoid future outbursts that might cause a mistrial. Under these circumstances, the trial court did not abuse its discretion in denying Kuhs's motion for mistrial.

### 3. Sufficiency of the evidence to support the felony-murder conviction

¶22 The jury found Kuhs guilty of felony murder, for which first degree burglary served as the predicate offense. *See* A.R.S. § 13-1105(A)(2) (2001) (defining felony murder as occurring when "in the course of and in furtherance of [a defined burglary] offense . . . , the person . . . causes the death of any person"). The burglary charge was predicated on Kuhs's entry of the apartment with the intent to assault Herrera with a knife. *See* A.R.S. § 13-1508(A) (defining first degree burglary as occurring if a person commits second or third degree burglary "and knowingly possesses . . . a deadly weapon or a dangerous instrument in the course of committing any theft or any felony").

¶23 Kuhs contends that the State presented insufficient

evidence that he entered Herrera's apartment with the intent to commit aggravated assault. Instead, Kuhs argues, he entered Herrera's apartment intending to commit murder.[4]

¶24 We review the sufficiency of the evidence by determining whether substantial evidence supports the jury's finding, "viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roseberry*, 210 Ariz. 360, 368–69 ¶ 45, 111 P.3d 402, 410–11 (2005). "Substantial evidence is proof that 'reasonable persons could accept as adequate . . . to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Bearup*, 221 Ariz. 163, 167 ¶ 16, 211 P.3d 684, 688 (2009) (alteration in original) (quoting *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)).

¶25 The State introduced evidence that Kuhs entered Herrera's apartment uninvited and armed with a knife. In his statement to police, Kuhs said he went to the apartment to talk

---

[4] Kuhs argues that he "only entered the apartment to commit murder," not to assault Herrera. He asserts that "one cannot commit felony murder when one committed burglary in order to commit murder." We rejected this argument in *State v. Moore*, reasoning that it would "be anomalous to conclude that first-degree murder occurs if a burglary with intent to assault results in death but not if the burglary is based on the more culpable intent to murder." 222 Ariz. at 13-14 ¶¶ 57–63, 213 P.3d at 162–63 (concluding that proof of entering with intent to commit murder suffices to establish felony murder through burglary). Thus, even if Kuhs's factual argument were correct, his legal argument would fail.

to Herrera about an altercation they had the preceding night. Kuhs explained that he thought Herrera wanted to fight him and that Herrera was "calling [him] weak." In a prolonged struggle, Kuhs inflicted several non-fatal stab wounds before delivering the wound that caused Herrera to collapse. Thus, although Kuhs claims to have entered with the intent to murder Herrera, the evidence amply supported the jury's finding that he entered Herrera's apartment intending to commit aggravated assault.

### 4. Denial of motion to strike jurors for cause

**¶26** Kuhs argues that the trial court erred by failing to strike two potential jurors for cause. Neither juror was seated on the jury. Because the State peremptorily struck one juror, Kuhs suffered no prejudice from the trial court's refusal to strike that juror for cause. We therefore address only the juror struck by Kuhs.

**¶27** In *State v. Hickman*, 205 Ariz. 192, 201 ¶¶ 39, 41, 68 P.3d 418, 427 (2003), this Court held that when defense counsel peremptorily strikes a juror, we will not find reversible error based on the trial court's refusal to remove that juror for cause unless the resulting jury was not fair and impartial. Kuhs does not claim that the jury that decided his case was not fair and impartial. We therefore conclude, as we did in *Hickman*, that no prejudicial error has occurred. *Id.; see also State v. Medina*, 193 Ariz. 504, 510–11 ¶¶ 16–19, 975 P.2d 94,

- 12 -

100-01 (1999) (on facts similar to those in *Kuhs*, finding no error in judge's refusal to strike juror).

**B.   Penalty Phase**

   1.   Jury coercion

¶28      Kuhs makes two jury coercion arguments.   First, he argues that the trial judge erred in rejecting the jury's "verdict" that it could not unanimously decide on a sentence of life or death.   Second, he argues that the trial court coerced the jury verdict by giving an impasse instruction after the jury had twice indicated that it was deadlocked.

¶29      At the beginning of the penalty phase, the court instructed the jury as follows:

> If you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

> Any verdict of death or life imprisonment must be unanimous.

> If you unanimously find that no mitigation exists, then you must return a verdict of death.   If you unanimously find that mitigation exists, each one of you must individually weigh that mitigation in light of the aggravating circumstances already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.

> If you unanimously find that mitigation exists and that it is sufficiently substantial to call for leniency, you must return a verdict of life.   If you cannot unanimously agree on the appropriate sentence, your foreperson shall tell the judge.

¶30      After receiving the case, the jury deliberated for less

than an hour before being excused for the day. The jury deliberated for several hours on the second day and during the morning of the third day. On returning from lunch, the jury sent a note to the judge stating: "We, the jury, cannot unanimously agree on the appropriate sentence."

¶31    The trial court immediately called counsel. Both agreed that the judge should give the following instruction, which was given to the jury within five minutes of receiving the jury's note: "Please continue to deliberate until four o'clock. . . . If you're still deadlocked, we'll bring you back in the courtroom at 10 tomorrow morning."[5]

¶32    The jury then deliberated until the end of the court day. When the jury recessed, the bailiff delivered a second note to the judge that stated, "We are still deadlocked following our deliberation." The court dismissed the jury for the day.

¶33    The next morning, the trial court discussed the second impasse note with counsel. The court suggested giving the impasse "instruction suggested by [Rule 22.4], and approved by the Arizona Supreme Court in [State v.] Andriano," 215 Ariz.

---

[5]    The judge initially wanted the jurors to continue to deliberate and return to the courtroom at 4:00 p.m. if they remained deadlocked. One of Kuhs's attorneys, however, could not return that afternoon. After additional discussion with counsel, it was agreed to address the jury the next morning at 10:00 a.m.

497, 508-09 ¶ 54, 161 P.3d 540, 551-52 (2007).[6] Neither the State nor defense counsel objected. Defense counsel stated as follows: "Judge, not that I have an objection, but I just don't want this to be a battle in futility. If they're locked now, I don't want them to go back there and get into a fist fight. If it's going to be a situation where it's just not going to happen, I think we should know that now."

The court agreed:

> And I don't disagree with what you said. The instruction actually asks them to write us a kind of a note, a detailed note, to say, "How could we help you?" And if they send me back a note, that says, "You can't," then it's over.
>
> . . . .
>
> I really want them to try to see if there's something we can't do to help them break. . . . I don't know what the split is, I don't know anything about it. My suggestion is, we send the instruction in, see what we get out. I don't disagree with you. I'm not going to let them sit there for a week.

Defense counsel approved the court's approach.

**¶34**     At 10:35 a.m., the court delivered the impasse instruction to the jury and deliberations continued. At 3:28 that afternoon, the jury announced its death penalty verdict.

---

[6]     The instruction is not in the record. Both parties agree, however, that the court delivered an instruction that followed the language of the sample instructions suggested in Rule 22.4 and approved by this Court in *Andriano*, 215 Ariz. at 508-09 ¶ 54, 161 P.3d at 551-52 (instruction); *id*. at 510 ¶ 60, 161 P.3d at 553 (court approval of instruction). Kuhs concedes that the language of the impasse instruction given was not coercive.

- 15 -

### a. Initial penalty-phase instruction

¶35    Kuhs argues that the instruction to the jury at the beginning of the penalty phase gave the jurors three distinct choices:  (1) return a unanimous verdict calling for a life sentence; (2) return a unanimous verdict calling for a death sentence; or (3) inform the judge that the jury could not unanimously agree on the appropriate sentence.  Kuhs bases his argument on the last sentence of the initial instruction, which read, "[i]f you cannot unanimously agree on the appropriate sentence, your foreperson shall tell the judge."

¶36    Kuhs maintains that by sending two notes stating that they were deadlocked, the jurors were informing the court that they had chosen the third option and made a final decision that they could not unanimously agree on a sentence.  Kuhs therefore contends that sending the jurors back twice to deliberate — once directing them to deliberate until 4:00 p.m. and once with an *Andriano* instruction — constituted coercion.

¶37    We review de novo whether the court misinstructed the jurors.  *See State v. Zaragoza*, 221 Ariz. 49, 53 ¶ 15, 209 P.3d 629, 633 (2009).  We will not reverse a conviction unless the instructions, taken as a whole, misled the jurors.  *Id.*

¶38    Kuhs focuses entirely on one sentence from an instruction given at the beginning of the penalty phase.  After closing arguments in the penalty phase, just before the start of

- 16 -

deliberations, however, the court again instructed the jury. This time the trial court focused on how the jury should decide on a verdict:

> Ladies and gentlemen of the jury, the case is now submitted to you for decision. . . .
>
> You will be given one form of verdict. It reads as follow[s] . . . :
>
> We, the jury, duly empaneled and sworn in the above-entitled action, upon our oaths, do unanimously find, having considered all of the facts and circumstances, that the defendant should be sentenced to, *and there's a line for life or a line for death.*

(Emphasis added.) Thus, just before deliberations, the jurors were clearly instructed they had two choices: a life sentence or a death sentence.

¶39    Kuhs contends that, to avoid confusion, the court should have also instructed the jurors that, "if you cannot agree, then we will give you further instructions." But Kuhs did not request such an instruction, so the question is whether the instructions given so misstated the law or misled the jury as to constitute fundamental error. We do not find that the initial instruction either misled the jury as to its duty or required the court to discharge the jury, without giving any further instruction, once the jurors indicated that they could not unanimously agree on a sentence. After reviewing all of the penalty-phase instructions, including the specific guidance provided just before the jury retired to deliberate, we conclude

- 17 -

that the instructions appropriately informed the jury of the verdict and sentencing options.

### b. *Sending the jury back to deliberate after two separate impasse or deadlock notes*

¶40 Kuhs argues that the trial court also erred in giving the *Andriano* instruction after receiving a second impasse note. Although he made no contemporaneous objection, Kuhs now argues that the court should instead have released the jury. Kuhs relies on A.R.S. § 13-752(K) (Supp. 2009), which requires that, "[a]t the penalty phase, if . . . the jury is unable to reach a verdict, the court shall dismiss the jury and shall impanel a new jury."

¶41 The judge, however, need not blindly accept the jury's indication of an impasse. The trial judge retains authority to assist a jury that has reached an impasse. Rule 22.4 of the Arizona Rules of Criminal Procedure, for example, explicitly permits the trial court to assist a deadlocked jury. It provides that, "[i]f the jury advises the court that it has reached an impasse," the court may ask the jurors if the court or counsel can assist them. *Id.; see also Andriano*, 215 Ariz. at 508-09 ¶ 60, 161 P.3d at 551-52 (noting that court may assist jury that has indicated a need for help).

¶42 We review a trial court's response to jurors for an abuse of discretion. *See, e.g., State v. Ramirez*, 178 Ariz.

116, 126, 871 P.2d 237, 247 (1994). In determining whether an abuse has occurred and whether the abuse coerced the jury's verdict, we examine "the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempt[] to determine if the independent judgment of the jury was displaced." *State v. Huerstel*, 206 Ariz. 93, 97 ¶ 5, 75 P.3d 698, 702 (2003).

¶43 In reviewing coercion claims, we have focused on whether the judge knew the numerical split among the jurors. *See, e.g.*, *State v. McCrimmon*, 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996) (calling knowledge of the jury's numerical division "an important factor when considering the totality of the circumstances"); *State v. McCutcheon*, 150 Ariz. 317, 320, 723 P.2d 666, 669 (1986) (noting that "[w]hen the numerical division is known, particularly if the division is lopsided, encouraging the jury to decide can amount to coercion"). We have also found the length of time that the jury has deliberated when the trial court delivers an impasse instruction to be important in determining coercion. *See Huerstel*, 206 Ariz. at 99 ¶ 17, 75 P.3d at 704 (determining that three days of deliberations following a three-week trial "did not clearly signal that this jury had reached an impasse").

¶44 In this case, these factors do not indicate coercion. The trial judge did not know the numerical division of the jury

or ask the cause of the deadlock. And the time the jury had deliberated before sending its impasse note was relatively brief. When the jury sent its first impasse note to the court, it had deliberated for approximately twelve hours, including lunch periods. Approximately three hours after being instructed to continue deliberations, the jury delivered the second impasse note to the court. The impasse instruction was given because the jury had indicated that it was deadlocked, not as an anticipatory measure motivated by the jury split or the length of the deliberations.

¶45 Kuhs argues that this case is governed by *State v. Huerstel*, in which we stated that a trial court may violate Arizona Rule of Criminal Procedure 22.4 by giving an impasse instruction before the jury has given an "affirmative indication" that it needs help. 206 Ariz. at 99 ¶ 17, 75 P.3d at 704. Kuhs argues that, as in *Huerstel*, the jury here never affirmatively indicated a need for assistance.

¶46 In *Huerstel*, after the jury deliberated for approximately three days without giving any indication that it was at an impasse, the trial judge, over counsel's objection, gave the jury an impasse instruction. *Id.* at 97-98 ¶ 8, 75 P.3d at 702-03. In contrast, Kuhs's jury sent two notes affirmatively indicating that it was at an impasse, and counsel did not object to the instruction or to the court's proposed

course of action.

¶47    *Huerstel* is distinguishable in other ways as well.  In *Huerstel*, our conclusion that the court coerced the jury verdict was based not only on the trial court's issuance of an impasse instruction without an affirmative indication from the jury that it had reached an impasse.[7]  We also relied heavily on the fact that the trial court knew the numerical division of the jurors and asked the holdout juror for clarification, which we found improperly pressured one juror to reconsider his position.  *Id.* at 98, 101 ¶¶ 12, 25, 75 P.3d at 703, 706.  In Kuhs's case, no such circumstances occurred.

¶48    We review the trial court's actions by examining the totality of the circumstances.  *See id.* at 97–101 ¶¶ 5–25, 75 P.3d at 702–06.  The record reflects that the experienced trial judge communicated with and sought approval from counsel each time before interacting with the jury.  During these communications, not only did neither party object, but both the prosecutor and defense counsel affirmatively approved the trial court's proposed instructions and course of action.  Immediately after receiving the first note from the jury, the judge

---

[7]    In *Huerstel*, after finding that the trial court's premature issuance of an impasse instruction violated Rule 22.4, we concluded that "standing alone, the court's premature giving of the instruction recommended by the comment to Rule 22.4 does not rise to the level of reversible error."  206 Ariz. at 100 ¶ 18, 75 P.3d at 705.

contacted all counsel and suggested that he would tell the jury to "[p]lease continue to deliberate until four o'clock. . . . If you're still deadlocked, we'll bring you back in the courtroom at 10 tomorrow morning." The prosecutor responded, "Sure, that's fine, Judge," and defense counsel replied, "I don't have any problem with that."

¶49     The next day, after the judge had received a second note from the jury indicating deadlock, he told counsel that he intended to give the jurors "the instruction suggested by Rule [22.4] and approved by the Arizona Supreme Court in *Andriano*." The State did not object, nor did Kuhs's counsel, who responded, "not that I object . . . to the instruction, but if it's going to be a . . . futile attempt, I would hate to send them back in there and get things even more cantankerous." The trial court agreed with defense counsel and acknowledged that if, upon receiving the impasse instruction, the jury decided there was nothing that the court could do to help, then the court would declare the case "over." Defense counsel then approved the court's proposed course of action.

¶50     On this record, we cannot find an abuse of discretion. Although we do not find the trial court's actions coercive in this case, we caution that, with less careful instruction and absent defense counsel's approval of the court's proposed actions, impermissible coercion might well be found when a jury

twice indicates a deadlock. The penalty phase of a capital case is unique. Unlike any other part of the trial, the jury's determination that a particular mitigating circumstance exists need not be unanimous, A.R.S. § 13-751(C) (Supp. 2009), and whether to impose the death penalty is based on "each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of any mitigating evidence." *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 472 ¶ 17, 123 P.3d 662, 666 (2005). Because of the individual nature of the penalty determination, there is more cause for concern that jurors may be coerced rather than convinced to change their views. Therefore, we caution trial courts to exercise special care, as did the court here, when faced with circumstances similar to those presented in this case.

### 2.  Jury instructions regarding sympathy

¶51    During the guilt phase of the trial, the jury was instructed that it "must not be influenced by sympathy or prejudice." At the aggravation phase, the court instructed that "[i]n deciding whether an aggravating circumstance exists, you're not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling."

¶52    Kuhs contends that these guilt- and aggravation-phase instructions resulted in an improperly instructed penalty-phase

jury because these earlier instructions could have led the jury to disregard sympathy during its penalty-phase deliberations. Because Kuhs did not object at trial, we review Kuhs's claim for fundamental error. *See State v. Valenzuela*, 194 Ariz. 404, 405 ¶ 2, 984 P.2d 12, 13 (1999).

**¶53**      To avoid confusing the jury regarding the applicable instructions, at the penalty phase the court destroyed all of the earlier jury instructions, without objection by either side. The court then issued new instructions, which included the following:

> You must not be influenced at any point in these proceedings by conjecture, passion, prejudice, public opinion, or public feeling.  Do not be swayed by mere sympathy not related to the evidence presented during the penalty phase.
>
>      . . . .
>
>      Mitigating circumstances are any factors that are a basis for a life sentence instead of a death sentence, including any sympathetic or other aspect of the defendant's character, propensity, history or record, or circumstances of the offense.
>
>      Mitigating circumstances are not an excuse or justification for the offense, but are factors that, in fairness or mercy, may be considered by you as extenuating or reducing the degree of defendant's moral culpability or blameworthiness.
>
>      . . .   You must consider and give effect to all mitigating circumstances that have been raised by any aspect of the evidence.  *You must disregard any jury instruction given to you at any other phase of this trial that conflicts with this principle*.

(Emphasis added.)

- 24 -

¶54    "The Eighth and Fourteenth Amendments of the United States Constitution require that the sentencer in a capital case 'not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *State v. Carreon*, 210 Ariz. 54, 70 ¶ 83, 107 P.3d 900, 916 (2005) (emphasis omitted) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).  Kuhs argues that if the jurors remembered the guilt- and aggravation-phase instructions and focused on them rather than the penalty-phase instructions they had just been given, they might have thought they were precluded from considering sympathy.

¶55    We presume that the jurors follow instructions. *See State v. Velazquez*, 216 Ariz. 300, 312 ¶ 50, 166 P.3d 91, 103 (2007) (citing *State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006)).  Kuhs does not provide any reason for us to conclude that the jurors chose to follow the earlier jury instructions, especially in light of the court's destruction of the earlier instructions, provision of new written instructions for the penalty phase, and direction to the jurors to disregard any "jury instructions given to you at any other phase of this trial that conflict [with each juror's duty to consider all mitigating evidence]."    The    penalty-phase    instructions

appropriately instructed the jury.

¶56    But even if the court had not informed the jurors at the penalty phase to disregard the guilt-phase instructions on sympathy, such inaction would not constitute fundamental error. *See Carreon*, 210 Ariz. at 71 ¶ 87, 107 P.3d at 917.

3.    Constitutionality    of    Arizona's    death-by-lethal-injection statute

¶57    The death penalty in Arizona is "inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections."  A.R.S. § 13-757(A) (Supp. 2009).  Kuhs argues that § 13-757(A) is unconstitutionally vague because it "does not establish a detailed protocol of chemicals to be used . . . [or] standards for the training and expertise of persons . . . conducting the executions."

¶58    We have previously found that Arizona's death penalty statute is not unconstitutionally vague in prescribing lethal injection as the method for imposing the death sentence. *Andriano*, 215 Ariz. at 510 ¶¶ 61-62, 161 P.3d at 553.  We have also held that a challenge to the protocol to be used during a lethal injection must be made by petition filed pursuant to Arizona Rule of Criminal Procedure 32.  *Id.* ¶ 62.

### III.  REVIEW OF SENTENCE

¶59    Because Kuhs's offense occurred after August 1, 2002,

we review the jury's finding of aggravating circumstances and verdict of death for abuse of discretion. A.R.S. § 13-756 (Supp. 2009). Although Kuhs did not argue that the jury abused its discretion, our review is mandatory. *State v. Morris*, 215 Ariz. 324, 340 ¶ 76, 160 P.3d 203, 219 (2007).

## A.   Aggravating Circumstances

¶60     We first consider the jury's finding of aggravating circumstances. We will uphold a jury decision "if there is 'any reasonable evidence in the record to sustain it.'" *Id.* at 341 ¶ 77, 160 P.3d at 220 (quoting *State v. Veatch*, 132 Ariz. 394, 396, 646 P.2d 279, 281 (1982)).

¶61     The jury found five aggravating circumstances beyond a reasonable doubt:  (1) Kuhs was convicted of the first degree burglary from this prosecution, A.R.S. § 13-751(F)(2) (Supp. 2009); (2) he had a previous conviction for a serious offense — a second degree burglary charge, A.R.S. § 13-751(F)(2); (3) he committed the murder in an especially heinous, cruel, or depraved manner, A.R.S. § 13-751(F)(6); (4) he committed the murder while on release from prison, A.R.S. § 13-751(F)(7)(a); and (5) he committed the murder while on probation for a prior felony, A.R.S. § 13-751(F)(7)(b).

¶62     The only aggravator that Kuhs contested at trial was

- 27 -

whether the murder was especially cruel.[8]  To prove cruelty, the State must prove "that the manner of death caused the victim to suffer mental and physical anguish and the defendant knew or should have known that suffering would occur."  *State v. Cañez*, 205 Ariz. 620, 624 ¶ 14, 74 P.3d 932, 936 (2003) (internal citation and quotation marks omitted).  The State established special cruelty by showing that Herrera suffered significant pain before his death.  Not only was he stabbed several times, but he ultimately died by bleeding to death while choking on his own blood.  Herrera had ample opportunity not only to feel pain, but also to contemplate his impending death.  After the final stab wound to the head, Herrera was not immediately unconscious, but lay immobile in a pool of his blood.  Kuhs left Herrera alive and dying after the fight and took no action to alleviate his suffering.  We conclude that the jury did not abuse its discretion in finding that the State proved the (F)(6) aggravator beyond a reasonable doubt.

## B.   Propriety of the Death Sentence

¶63     We also must consider whether the jury abused its discretion in determining that death is the appropriate

---

[8]   The jury plainly did not abuse its discretion in finding the (F)(2) or (F)(7) aggravators.  The State properly used the burglary conviction from this case and a prior burglary conviction to establish the (F)(2) aggravating factors, *see* A.R.S. § 13-751(F)(2), and proved that Kuhs committed this murder while on release from prison and serving probation for a prior offense, *see* A.R.S. § 13-751(F)(7).

sentence. Although Kuhs presented mitigation evidence, the jury found the mitigation not sufficiently substantial to call for leniency. *See* A.R.S. § 13-751(E). "[W]e will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220.

¶64    Kuhs contended that the crime resulted from poor impulse control caused by ADHD or antisocial personality disorder. Kuhs was relatively young (twenty-one) when the murder occurred, he grew up in a poor family, and he was abused at least once at age nine by his mother's boyfriend. The record also contains some evidence of remorse and testimony from which the jury could have found that Kuhs was under the influence of methamphetamine, marijuana, or alcohol during the attack, although he was not so impaired as to preclude criminal responsibility.

¶65    The mitigation in this case, however, was not compelling. Kuhs's alleged mental disorder is linked to the incident itself only insofar as it might have made Kuhs more impulsive. And Kuhs's childhood was not so difficult or abusive that it mitigates his actions in committing this murder. Moreover, there was evidence that Kuhs possessed average or above average intelligence. Under the highly deferential

standard of review, we cannot conclude that the jury abused its discretion in not finding the mitigation sufficiently substantial to call for leniency and instead rendering a verdict of death in this case.

## IV. CONCLUSION

**¶66** For the foregoing reasons, we affirm Kuhs's conviction and death sentence.

_____
Rebecca White Berch, Chief Justice


CONCURRING:


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice

## Issues Raised to Avoid Federal Preclusion

For purposes of federal review, Kuhs raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Harrod,* 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2. The death penalty is imposed arbitrarily and irrationally in Arizona in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution, as well as Appellant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, § 4 of the Arizona Constitution. *State v. Beaty,* 158 Ariz. 232, 762 P.2d 519 (1988).

3. Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona

---

[9]  The Appendix is taken verbatim from Kuhs's list of issues raised to avoid preclusion.

Constitution.

4. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing,* 200 Ariz. 347, 361, 26 P.3d 1118, 1132 (2001).

5. Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, §§ 1, 4, and 13 of the Arizona Constitution. *Sansing,* 200 Ariz. at 361, 26 P.3d at 1132.

6. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Harrod,* 200 Ariz. at 320, 26 P.3d at 503. Proportionality review serves to identify which cases are above the "norm" of first-degree murder thus narrowing the class of defendants who are eligible for the death penalty.

7. Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments

to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Ring,* 200 Ariz. 267, 284, 25 P.3d 1139, 1156 (2001) (*Ring I*), rev'd on other grounds by *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 2443 (2002).

8. A.R.S. § 13-703.01 provides no objective standards to guide the sentencing judge in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli,* 200 Ariz. 365, 382, 26 P.3d 1136, 1153 (2001).

9. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4 and 15 of the Arizona Constitution. *State v. Poyson,* 198 Ariz. 70, 83, 7 P.3d 79, 92 (2000).

10. A.R.S. § 13-703.01 does not sufficiently channel the sentencer's [sic]. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth

- 33 -

Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Pandeli,* 200 Ariz. at 382, 26 P.3d at 1153.

11. Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

12. Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Miles,* 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

13. Arizona's death penalty statute is unconstitutional in that it requires defendants to prove their lives should be spared, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Fulminante,* 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).