NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JUAN JOSE RUIZ-GASTELUM, JR., *Appellant.*

No. 1 CA-CR 21-0510
FILED 9-29-2022

Appeal from the Superior Court in Mohave County
No. S8015CR202001219
The Honorable Billy K. Sipe, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Jill L. Evans Attorney at Law, Flagstaff
By Jill L. Evans
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge Maria Elena Cruz delivered the decision of the Court, in which Judge Angela K. Paton and Judge Peter B. Swann joined.

_____

**C R U Z**, Judge:

¶1          Juan Jose Ruiz-Gastelum, Jr. appeals his conviction and sentence for aggravated assault.  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2          Ruiz-Gastelum was attending a party at an apartment where the victim, B.B., was staying when a fight broke out and partygoers fled. People were gathering one another's belongings as they left, and B.B. grabbed a backpack belonging to Ruiz-Gastelum—whom B.B. knew as "Puppet."  The backpack was passed between multiple people before B.B. returned it to Ruiz-Gastelum a few hours later.

¶3          The next day, Ruiz-Gastelum returned to the apartment with Kurt Richards, and said his cellphone was missing.  Richards sat on the couch with a gun while Ruiz-Gastelum and B.B. unsuccessfully looked for the phone.  A couple of days later, Richards returned to the apartment— alone and high on drugs.  Richards told B.B. he was "supposed to kill" him because of the cellphone but would shoot him in the hand or foot instead. Richards then shot B.B. once in the foot.  B.B. changed residences, did not contact authorities, and did not seek outside medical treatment.

¶4          Police learned about the shooting and questioned B.B.— which led to arrests of Ruiz-Gastelum and Richards.  Richards entered a plea agreement with the State that was conditioned on him testifying at Ruiz-Gastelum's trial.

¶5          The State tried Ruiz-Gastelum, under an accomplice theory, for aggravated assault with a deadly weapon.  Richards testified that he, like B.B., knew Ruiz-Gastelum only as "Puppet"; Ruiz-Gastelum was concerned about finding his phone because it contained information about other people; Ruiz-Gastelum "wanted" Richards to kill B.B.; Ruiz-Gastelum dropped Richards off a couple of blocks from B.B.'s apartment before the shooting; Richards had only met B.B. the one time before shooting him; and Richards had no other reason to shoot B.B.

**¶6**        A jury found Ruiz-Gastelum guilty as charged and found three aggravating factors proven.  The superior court sentenced him as a repeat dangerous offender to a maximum prison term of twenty years.  *See* Arizona Revised Statutes ("A.R.S.") section 13-704(D).   Ruiz-Gastelum timely appealed.  We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A).

## DISCUSSION

I.      Admission of "Cartel" Evidence

**¶7**        Before trial, Ruiz-Gastelum moved to preclude admission of gang and drug-related evidence that included images purportedly sent to him through Facebook by C.P., a documented gang member who was believed to be involved with a drug cartel.  The images showed a heavily tattooed C.P. in a jail or prison cell, drugs, drug paraphernalia, and a large quantity of cash.  The State proposed to offer the images to explain Ruiz-Gastelum's motive for wanting B.B. killed—namely, that Ruiz-Gastelum was concerned C.P. or others linked to the cartel would come after him if the images fell into the wrong hands.  The State assured the court it would not use the images to suggest that Ruiz-Gastelum was a drug dealer or working for a cartel.  The State also asserted it would not offer evidence Ruiz-Gastelum was gang-affiliated unless he opened the door to such evidence.

**¶8**        The superior court precluded the Facebook images and evidence of gang affiliation in the State's case-in-chief.  Although the court found the images relevant to establishing motive, it reasoned that the State's theory was speculative and the risk of prejudice substantially outweighed the images' probative value.  *See* Ariz. R. Evid. 403.  The court emphasized that its ruling did not prevent the State from offering other evidence of motive.

**¶9**        At trial, the State asked B.B. a series of questions relating to Ruiz-Gastelum's concern about the missing phone:

> Q.      When—from the time that you left the party until and including the time when Puppet came back to the apartment to search for it—and this is just a yes-or-no question—had Puppet ever said anything to you about why finding the phone was such a big deal?
>
> A.      No.

> Q. Did he ever tell you anything about why he wanted it back so badly?
>
> A. No.
>
> Q. Did you tell [a detective] that Puppet had said anything to you about why the phone was so important?
>
> A. Linked to the cartel.
>
> Q. Wait.
>
> A. That it was—
>
> Q. Don't—

Ruiz-Gastelum objected and moved to strike. The court sustained the objection and instructed the jury to "disregard the last statement." The State then asked B.B. whether he understood there to be "sensitive information about other people on the phone?" B.B. answered yes.

¶10 After B.B. testified, a juror proposed to ask him: "Is Puppet a drug dealer or did he ever deal drugs to you?" The court did not ask the question. During Richards' subsequent testimony, more juror questions were submitted: "Is Puppet the gang leader?" "Did Puppet pay you any money to do the hit?" "What led Richards and 'Puppet' to meet in the first place?" The court did not present any of those questions.

¶11 Ruiz-Gastelum moved for a mistrial based on B.B.'s testimony about "the cartel." He argued the juror questions revealed a belief "that this is some sort of cartel hit" and demonstrated that jurors had not complied with the court's instruction to disregard the testimony. The superior court denied the motion, reasoning (1) it had not precluded the State from offering evidence—apart from the Facebook images—of Ruiz-Gastelum's motive for wanting B.B. killed, (2) the juror questions did not necessarily arise from the "cartel" statement, and (3) jurors were presumed to follow the court's instruction to disregard stricken testimony—which the court would reiterate in the final instructions. After Ruiz-Gastelum was found guilty, he moved for a new trial on the ground that the court's mistrial ruling was an error of law. *See* Ariz. R. Crim. P. 24.1(c)(4). The court denied the motion.

¶12 Ruiz-Gastelum argues the superior court should have granted a mistrial or new trial because the "cartel" testimony implied he was a gang member or affiliated with a drug cartel. He contends that the effect of the "cartel" testimony was not only revealed in the juror questions but was compounded by the State's references to Ruiz-Gastelum as "Puppet" throughout the trial and by the presence of uniformed gang task force officers observing the trial.[1]

¶13 We review the superior court's mistrial ruling for an abuse of discretion. *State v. Kuhs*, 223 Ariz. 376, 380, ¶ 18 (2010). "The trial court must consider two factors in determining whether to grant a motion for a mistrial based on a witness's testimony: (1) whether the testimony called to the jurors' attention matters that they would not be justified in considering in reaching their verdict and (2) the probability under the circumstances of the case that the testimony influenced the jurors." *State v. Lamar*, 205 Ariz. 431, 439, ¶ 40 (2003). Our review is deferential "because the trial judge is in the best position to evaluate the atmosphere of the trial, the manner in which the objectionable statement was made, and the possible effect it had on the jury and the trial." *Kuhs*, 223 Ariz. at 380, ¶ 18 (citations and internal quotation marks omitted).

¶14 The superior court's refusal to grant a mistrial was within its discretion. First, the reference to "cartel" did not necessarily imply Ruiz-Gastelum was linked to a cartel or gang. Combined with evidence that Ruiz-Gastelum's phone contained sensitive information about *other* people, the "cartel" remark just as easily supported the State's theory that Ruiz-Gastelum feared the cartel would come after *him* if he did not get the phone back. *See Lamar*, 205 Ariz. at 439, ¶ 42 (tenuous link between witness's "incomplete statement" and prejudicial inference made its influence on the jury improbable). The court never prohibited the State from eliciting testimony about a cartel in support of that theory. Second, other trial evidence, including Richards' drug and gun use, the fact that neither B.B. nor Richards knew Ruiz-Gastelum's real name and seemed intimidated by him, and B.B.'s decision not to seek police or medical assistance after the shooting, gave jurors reason to suspect Ruiz-Gastelum was involved in some sort of criminal activity regardless of the "cartel" testimony. Thus, the juror questions about drugs and gangs were not necessarily linked to the "cartel" statement. Third, the prosecutor and defense counsel both

---

[1] We address, below, Ruiz-Gastelum's separate claims of prosecutorial error based on the State's use of "Puppet" and the attendance of gang task force officers at trial.

acted immediately to prevent B.B. from elaborating on the "cartel" testimony and the court instructed jurors to disregard the statement, both specifically after it was made and generally during the preliminary and final jury instructions. *See id.* at ¶¶ 42-43 (immediate objection and instruction to disregard testimony diminished the likelihood of prejudicial impact). Because the court's mistrial ruling was sound, so too was its denial of Ruiz-Gastelum's motion for a new trial based on an "err[or] in deciding a matter of law." Ariz. R. Crim. P. 24.1(c)(4).

¶15 Nor did the State's references to Ruiz-Gastelum as "Puppet" or the presence of gang officers at trial alter the reasonableness of the court's decision not to grant a mistrial or new trial. Ruiz-Gastelum did not raise those issues in his argument for a mistrial. *Cf. State v. Garcia*, 224 Ariz. 1, 11, ¶ 31 (2010) (holding the trial court did not err by failing to sua sponte grant a mistrial for the trial's guilt phase where the defendant only moved for a mistrial of the aggravation phase and the risk of prejudice was limited to the aggravation phase). And for the reasons stated below, we conclude that the references to "Puppet" and the attendance of gang officers at trial did not improperly influence jurors' consideration of the case.

II.     Prosecutorial Error

¶16 Ruiz-Gastelum argues his conviction should be reversed based on two ongoing occurrences of prosecutorial error.[2] First, he challenges the State's references to Ruiz-Gastelum as "Puppet," rather than his real name, during the trial. Second, he complains that the State allowed identifiable members of a statewide gang task force to observe the proceedings.

¶17 "We will reverse a conviction due to prosecutorial error only if (1) [error] is indeed present; and (2) a reasonable likelihood exists that the [error] could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Robinson*, 253 Ariz. 121, 142, ¶ 64 (2022) (citation and internal quotation marks omitted). We typically review claims both individually and cumulatively, considering objected-to claims under a harmless error standard and unobjected-to claims for fundamental error only. *Id.* at 142-43, ¶ 64. Because Ruiz-Gastelum did not preserve an

---

[2]     Although Ruiz-Gastelum describes the challenged acts as prosecutorial "misconduct," we treat his claim as one of prosecutorial "error" because he does not assert a violation of ethical rules. *See State v. Murray*, 250 Ariz. 543, 548, ¶ 12 (2021).

objection to the State's use of "Puppet," he must establish fundamental error on that issue. Ruiz-Gastelum objected to the gang officers' presence in his motion for a new trial. *See* Ariz. R. Crim. P. 24.1(c)(2). We review the denial of that motion for an abuse of discretion. *State v. West*, 238 Ariz. 482, 497, ¶ 50 (App. 2015).

¶18 Ruiz-Gastelum fails to show individual or cumulative error justifying reversal. First, the State's references to "Puppet" were permissible. B.B. and Richards both testified they knew Ruiz-Gastelum only as "Puppet"—a moniker that does not, in itself, imply criminal behavior or bad character. The State's use of "Puppet" was reasonable because it referred to Ruiz-Gastelum as such only when it examined B.B. and Richards and when it described that testimony during opening and closing statements. *Cf. United States v. Dean*, 59 F.3d 1479, 1491-92 (5th Cir. 1995) (use of defendant's nickname at trial permissible where identifying witnesses knew defendant only by nickname, and nickname, standing alone, did not suggest criminal behavior). Indeed, even defense counsel referred to Ruiz-Gastelum as "Puppet" when questioning B.B. and Richards. In other circumstances, the State referred to Ruiz-Gastelum by his real name or "the defendant." Nor did the State's references to "Puppet" reveal an attempt to paint Ruiz-Gastelum as a gang member or otherwise incite juror prejudice against him. *Cf. State v. Filipov*, 118 Ariz. 319, 324 (1977) (references to defendant as "Gypsy," combined with other improper statements, showed inappropriate attempt to link the defendant to the Mafia and appeal to juror prejudice).

¶19 Even assuming the State's references to "Puppet" were improper, Ruiz-Gastelum does not show that "a reasonable jury could have plausibly and intelligently returned a different verdict" absent that usage. *See State v. Escalante*, 245 Ariz. 135, 144, ¶ 31 (2018). Ruiz-Gastelum contends that the use of "Puppet," combined with other facts in the case, "necessarily" suggested he was a criminal. But as that argument recognizes, evidence outside of the nickname "Puppet" already suggested he was involved in criminal activity. Given such other evidence, Ruiz-Gastelum cannot show that jurors could have intelligently returned a different verdict merely because the State referred to him as "Ruiz-Gastelum" or "the defendant" rather than "Puppet."

¶20 We also reject the claim that it was error to allow gang task force officers to attend trial. The case agent who ran the investigation was a member of that task force and sat at counsel's table during trial, but he did not wear a law enforcement uniform or refer to his gang position when he testified. Although several other members of the task force attended

portions of the trial, as spectators, in uniform, they sat about 15 feet away from the nearest juror and their uniforms contained just one indication of their gang assignment—a shoulder patch that included the words "state gang task force" in lettering about 1/8 of one inch tall. The record supports the superior court's findings that the officers did not conduct themselves in a manner prejudicial to Ruiz-Gastelum, jurors were too far from the officers to see the "gang task force" patches on their uniforms, and jurors showed no recognition or indication they were influenced by the officers' presence.

III.     Limitation on Cross-Examination

**¶21**        The State moved before trial to preclude evidence of statements made by the prosecutor and case agent to Richards during a "free talk" about a possible plea deal. In that discussion, the case agent told Richards this was a "great opportunity" for him "to help [him]self out of this situation." The prosecutor then told Richards that while the State's case against him was "probably pretty much air tight," the prosecutor did not "know that [he] could win a trial against [Ruiz-Gastelum] without [Richards'] cooperation." The prosecutor added that Richards was not "like icing on the cake" and that if he did not make a deal or if he "piss[ed] backwards on [the State] in court," Ruiz-Gastelum would "probably walk[]."

**¶22**        Ruiz-Gastelum objected to preclusion, arguing that the "free talk" statements were "critical" to jurors' determination of Richards' credibility because they showed his incentive to implicate Ruiz-Gastelum at trial. The superior court granted the State's motion.

**¶23**        During its direct examination of Richards at trial, the State asked whether "anyone ever told [him] what [he had] to say in court?" Richards said no. Based on this exchange, Ruiz-Gastelum argued the State had opened the door to evidence of the prosecutor's statements during the free talk. The superior court disagreed the State had opened the door and adhered to its ruling precluding evidence from the free talk.

**¶24**        "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation and internal quotation marks omitted). The opportunity to cross-examine a witness for bias is an essential purpose of the Confrontation Clause. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *see also State v. Morales*, 120 Ariz. 517, 520

(1978) ("[G]reat latitude should be allowed in the cross-examination of an accomplice or co-defendant who has turned State's evidence and testifies on behalf of the State on a trial of his co-defendant.") (citation and internal quotation marks omitted). Ruiz-Gastelum asserts that prohibiting him from offering impeachment evidence from the free talk violated his rights to present a complete defense and effectively cross-examine Richards. Evidentiary rulings are generally reviewed for an abuse of discretion, but we consider those that implicate the Confrontation Clause de novo. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006).

**¶25** While we agree that Richards' credibility was a critical aspect of Ruiz-Gastelum's defense, the superior court's exclusion of evidence from the free talk did not amount to reversible error. The right of cross-examination is not unlimited. *State v. Riggs*, 189 Ariz. 327, 331 (1997). To determine whether a restriction goes too far, we consider "whether the defendant has been denied the opportunity of presenting to the trier of fact information which bears either on the issues in the case or on the credibility of the witness." *Id.* (citation and internal quotation marks omitted).

**¶26** Here, the trial evidence showing Richards' incentive to implicate Ruiz-Gastelum was ample. It was undisputed that Richards alone shot B.B. Richards acknowledged that law enforcement believed Ruiz-Gastelum was behind the shooting; Richards knew he faced prison time in the "double digits" if he did not testify against Ruiz-Gastelum; and he had not yet been sentenced. Given the admitted evidence showing the strength of the State's case against Richards, the need for his testimony to convict Ruiz-Gastelum, and Richards' prison exposure if the State renounced the plea deal, further admission of the free talk statements would have been cumulative. The superior court's ruling, therefore, did not impair Ruiz-Gastelum's rights. *See State v. Abdi*, 226 Ariz. 361, 367, ¶ 24 (App. 2011) (no error in limiting cross-examination going to bias where "the jury was already aware of a strong potential motivation for the [witness] to be untruthful, and the [excluded] evidence would have been cumulative at best.").

IV.    Dangerous Offense Finding

**¶27** Ruiz-Gastelum was sentenced under A.R.S. § 13-704(D) for committing a "dangerous offense." He argues his sentence is unlawful because the dangerous offense finding was not submitted to the jury.

**¶28** A "dangerous offense" is "an offense involving the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument

or the intentional or knowing infliction of serious physical injury on another person." A.R.S. § 13-105(13). Ruiz-Gastelum was charged and found guilty of aggravated assault "with a deadly weapon" under A.R.S. § 13-1204(A)(2). He did not receive an unlawful sentence because the dangerous offense finding was implicit in the jury's verdict. *See State v. Smith*, 146 Ariz. 491, 499 (1985) ("[N]o specific finding of dangerousness is required where an element of the offense charged requires proof of the dangerous nature of the felony."); *State v. Suniga*, 145 Ariz. 389, 396 (App. 1985) (dangerousness finding implicit in guilty verdict for aggravated assault using a deadly weapon or dangerous instrument). Ruiz-Gastelum's contention that jurors could have made a separate dangerousness finding inconsistent with the verdict does not entitle him to be resentenced. His reliance on *State v. Larin*, 233 Ariz. 202, 213, ¶ 42 (App. 2013), in which the jury actually rendered a decision inconsistent with an implicit dangerousness finding, is therefore misplaced.

**CONCLUSION**

¶29        We affirm.

